J. RAY ARNOLD LUMBER COMPANY, A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF FLORIDA, *Plaintiff in Error*, v. THOMAS L. CARTER, AS ADMINISTRATOR OF THE ESTATE OF WALTER L. CARTER, DECEASED, *Defendant in Error*.

Division A.

Opinion Filed March 26, 1926.

Petition for rehearing denied April 29, 1926.

550

*McCollum & Howell*, for Plaintiff in Error;

*MacFarlane & Pettingill*, for Defendant in Error.

STRUM, J.—In an action under Sec. 4960, Rev. Gen. Stat. 1920, to recover for the wrongful death of his intestate, Thomas L. Carter, ad administrator, who was plaintiff below and is defendant in error here, recovered judgment against the defendant below. The declaration alleges that the death of plaintiff's intestate, Walter L. Carter, was caused by the negligent operation of a logging train by servants of defendants below, the specific act of negligence alleged being: "That the said train was being propelled backward by a steam engine attached to the rear thereof and without any light at the front end of said train or any other precaution for the purpose of warning persons so using said track as a foot path, as aforesaid, of the approach thereof." The declaration, as against demurrer, was heretofore sustained by this Court in Carter v. Arnold

Lbr. Co., 83 Fla. 470; 91 South. Rep. 983, when it was held that the allegation therein referred to, "with others that are admitted by the demurrer show a want of reasonable care and diligence in the operation of the log train under the circumstances, and * * * therefore a cause of action is stated even if the decedent was technically merely a licensee." The case was tried upon defendant's pleas of the general issue, and contributory negligence of the deceased. At the conclusion of plaintiff's testimony in chief defendant moved for a directed verdict, renewing the motion at the end of all the testimony. In each instance the motion was denied and an exception taken. After verdict for the plaintiff, a motion for judgment *non obstante veredicto,* and a motion for a new trial were made by the defendant, both of which were overruled, and to the judgment when entered this writ of error was taken.

The testimony shows that defendant was operating a saw mill, and as an incident to such business also operated an ordinary log or tram road for the sole purpose of transporting logs from the forest to defendant's saw mill. Between 8:00 and 9:00 o'clock P. M., on the 15th day of March, 1920, well after darkness had fallen, defendant was operating along this road what is usually known as a "logging train," which consisted of a steam locomotive, one flat car which was coupled next to the tender of the locomotive, and twelve log cars coupled one after the other behind the flat car. The log cars were "skeleton" trucks, connected by "reacher poles" or coupling poles thirty-five feet long, the length of the train over all being 248 yards. This train was backing from the saw mill out to the log camp for the purpose of picking up a load of logs, it being the usual custom in operating such trains to "head in (to the mill) and back out" to the log camp. In the direction in which the train was moving, all the cars preceded the

locomotive, the leading unit of the train being a log truck, the locomotive being at the opposite end. The train crew consisted of the engineer, the fireman and a third man referred to as the flagman, or "rear rider," whose duty it was to ride upon the car at the opposite end of the train from the engine, carrying a lighted lantern at night. When the train is backing, the rear rider's station would be on the leading car, that is, the car farthest from the locomotive.

The undisputed testimony further shows that the locomotive on this train was equipped with both a head light and rear light, the latter being mounted on the locomotive cab for use in illuminating the train and the track ahead when the train was backing. Both lights were burning at the time the deceased was injured. These lights were of a special design, new at the time. They were as penetrating as head lights used on passenger and freight trains on main line railroads, and each of a specially diffusive character, being designed for an unusual degree of "spread," so that at a distance of 250 yards from the locomotive they illuminated an area of 160 feet to each side of a straight track. As a witness for the defendant testified: "When you get out a hundred or two yards from the engine there would be a wide area that was splendidly illuminated." And as a witness for the plaintiff expressed it: "It was a good big light,—a mighty shinin' light, I know; because I could see down the train with it, as it passed, pretty plain. Yes, if you was on the train, you could see past the train. If the train's not too long, it would shine way down past the train. Yes, the ray of that light goes a good long distance, one on each side, going and coming. Yes, sir-ee, a fellow way down the track could see that light. Well, if the road is good and straight, and there was no grade or hill, I couldn't tell how far a fellow could see that light on a dark

night. Yes, he could see it for miles,—for a good long ways. Yes, sir, I expect a fellow could see it fully a quarter. I think the light on the front of the engine was the same sort of light. Yes, that was a pretty well lighted up engine, they keep it lighted up that way—a regular logging train." The same witness, referring to the state of darkness obtaining just before the fatal accident to the deceased, further said: "It was good dark all right,—it was mighty dark. Yes, sir, it was dark enough for the light to shine, it was 'dark-dark.'" Another witness for the plaintiff, after referring to the lantern carried by the "rear rider," said: "But this other light was bright,—the other light was shinin' brightly. I mean this light on the engine. This light on the engine shone along the cars. The engine was backing and it had a head light on the rear, the light I saw from the engine was on the tender, they had a light placed up there. Those cars were empty, and this light from the engine shone along the empty cars as they were being pushed." The last two descriptions of the light by plaintiff's witnesses referred to the light as it appeared to them a few minutes before the injury to the deceased.

As this train was approaching the log camp at the outer end of the line, it ran over and mortally wounded the deceased upon a small trestle. The stream spanned by this trestle was a small branch, about fifteen to twenty feet wide from bank to bank, the length of the trestle being about twenty feet. The stream dried up during dry seasons, but at the time of the accident the water under the trestle was about one foot deep. The distance from the bed of the stream to the top of the rail on which the train runs was estimated by various witnesses as from two to two and one-half feet, the trestle being "right down on the water." There were no railings on the sides of the trestle, nor any embankments at the ends. It was "right along on level

ground.'' Alongside of the log road, and close by, was a country dirt road for use by the public. There was no bridge where the country road crossed the creek, and from the time the log road was built the public had been accustomed to habitually leave the country road at this point and walk across the creek on the trestle, that being the only way to avoid wading in the water. The public had thus used the trestle without objection from the defendant, the use being by the public generally and having been continued for so long that the defendant knew, or should have known of its use by the public, and that persons would likely be upon the track at that point. The log road track, as it approached this trestle was not straight, but there were two curves, making together an ''S'' curve, within a distance of about half a mile before reaching the trestle, when going out from the mill, as the train was traveling at the time of the accident. Approaching the first curve the grade is upward over a hill. After passing the first curve the grade is downward again to the second curve. After passing the second curve, the track was substantially straight and level to the trestle. From the end of the second curve to the trestle was about 150 yards.

The undisputed testimony further shows that within the distance of about three-quarters of a mile before reaching the trestle, the whistle of the locomotive had sounded three ''crossing signals,'' each of which was two long blasts and two short blasts, and one ''signal blow'' consisting of four blasts, making sixteen blasts in all. The first ''crossing blow'' was sounded when the locomotive was about three-quarters of a mile from the trestle, after which the ''signal blow'' was sounded, and then two more ''crossing blows,'' for public crossings, the last of which was for the trestle on which the deceased was injured, and was sounded when ''the rear of the train was pretty well going down the

hill'' before reaching the trestle. Concerning the noise made by the train itself as it went along, a witness for the plaintiff by whose house the train passed a little more than one-half mile before reaching the trestle, testified: ''Yes, I was standing out on the porch when the train came in sight that night, and could hear it coming. It was runnin' —it made a pretty bad racket, like it was running somewhere. Yes, it made a pretty big racket, coming to my house, and I, of course, always noticed it. Well, it made about the same sort of racket going off as it made coming— I couldn't see or hear much difference. Yes, sir, it was the proverbial log train, with all of its attending noise. It 'helt' on to its noise, while it was runnin', and that would stamp it as the proverbial log train, with its wheels screeching. Yes, sir, it was grinding away all right, and I could hear that noise as it came along, I could hear that plain. Yes, sir, I could hear that about as far as I could hear a whistle, especially on the curves, it was sqealin' worse than on the level road. Yes, it was squealin' that night, it made about as much racket as one of 'em could make, I guess.'' Another witness for the plaintiff, who just before the accident was going toward a house near the scene of the accident, testified: ''Yes, I heard the train before I went in the house, I heard it when I was going down the railroad to the house. I heard the cars squealing and the exhaust coming up on the other side of the hill. Yes, I heard it distinctly. * * * When I heard the train before I went into that house the train was three-quarters of a mile off, or may be a mile, somewhere along there,—'betwixt' a half mile and a mile I will say * * * and I heard the squealing of the train as it come around the curve, that's how come me to notice it.'' The engineer testified that the train was running about five miles an hour as it approached the trestle, having been slowed down to listen for a reply

to his "signal blow," and for the further purpose of safely entering the log camp, which was about 200 yards beyond the trestle. The deceased was returning from the log camp to his father's house, the trestle being between the camp and the house, the fatal accident occurring when the deceased was crossing the trestle. The deceased was raised in the neighborhood where the accident occurred, and was familiar with the situation of the creek, road and trestle. He had sold meat in the log camp "pretty near every Saturday," including the Saturday before his death which occurred on Monday.

The plaintiff below based his claim on negligence in the operation of the train entirely upon the assertion that at the time of the accident the "rear rider" was not at his proper station on the leading truck or car for the purpose of keeping a look-out for persons whom the defendant should have anticipated were likely to be on the track at that point, and that there was no light on the leading truck. Plaintiff's contention in reference to the illumination afforded by the rear light on the engine is, that the leading truck of the train reached the trestle and ran over deceased, the train was not upon a straight track but was still partly passing along the last curve before reaching the trestle, the engine not yet having rounded the curve, as a result of which the rear light of the engine, instead of shining straight down the track and illuminating the train, shone at an angle with the direction followed by the track in the vicinity of the trestle, and off into the woods on the side of the track, leaving the leading end of the train in darkness, so that instead of being a warning to deceased it deceived him with reference to the close approach of the leading truck. The engineer of the train, as a witness for the defendant, testified that when the train left the mill the "rear end rider," with his lantern lighted, was on the leading

truck at the opposite end of the train from the locomotive; that he observed the "rear end rider" from time to time on the way out, and his light seemed to be in the same place; that he could see him all the time except when the train rounded curves, and that he kept him in sight until his light went around the last curve before reaching the trestle. The engineer is corroborated in this testimony by the negro fireman on the train who testifies substantially to the same facts. A witness for the plaintiff testified concerning the "rear rider's" light: "From the engine and its (the train's) length, I saw a light on those trucks. There was a light somewhere in the train; I don't know just how far down it was, but I noticed that. There was only one that I noticed; that light was somewhere between the ends, but I couldn't say just exactly where, but it was somewhere in the train between the engine and the cars. I supposed it was just a lantern,—a hand lantern." This testimony was with reference to the time when the train passed the witness' house a little more than half mile before reaching the trestle. Plaintiff's witness (when testimony has been previously referred to), who was at a house in the near vicinity of the trestle at the time of the accident, and who was among the first to reach the deceased, further testified: "Just as I walked out of the house and got to the gate, I seen a nigger wavin' his lantern and hollerin': 'Hold up, hold up, we have run over a man'. He was wavin' his lantern this way (illustrating). I went right up there * * *. Yes, I said that negro came running up from the rear end of the train. He walked up as I got there." In the argument before us there was considerable contention as to whether this witness meant that the negro came running up from the engine end of the train, which was the front end of the train itself, but the rear end with reference to the direction in which it had been moving. The matter is considerably clarified, however, by the testimony of another

of plaintiff's witnesses, who testified: "As the train was stopping I heard the words: 'Come here somebody, we have run over a man,' or 'killed a man,'—I do not remember which * * * .. No, sir, I didn't recognize the voice of the man who said that. I don't know who it was, but I do know it appeared to me it must've been the man on the rear end of the train that said those words, because it was in that direction." Obviously this testimony referred to that end of the train which ran over the deceased. The physical circumstances which then obtained are entirely inconsistent with such a statement having been made by a man situated on the engine end of the train.

The "rear rider" was not produced as a witness by either party, witnesses for the defendant testifying that he had disappeared shortly after the accident and that extensive and repeated efforts to locate him had been unsuccessful.

The testimony is conflicting with respect to the degree of the curve along which the train passed as it approached the trestle, the evidence for the plaintiff being that they were "sharp" curves, while that for the defendant was that they were "easy" or "very mild" curves. Each party introduced a map of the vicinity purporting to show the exact degree of the curves in relation to the trestle and other surroundings.

There is testimony that when the deceased left defendant's log camp to go across the trestle to his father's house just before the accident "he (the deceased) started away (and) as he stepped back on the track, he staggered pretty bad—that's all that he noticed about him, as to his condition. He went away staggering pretty bad. No, I don't know what was the occasion of that." Another witness for the plaintiff testified that deceased "stumbled" as he went away, and a witness for defendant that "he wasn't walking straight,—he wobbled some,—staggered."

There was also testimony admitted in rebuttal of plaintiff's testimony as to the good character and habits of the deceased, that the deceased was drunk on the day before his death, the witness testifying: "Q. Why did you judge he was drunk the day before?" "A. Well, I found him in a little mudhole, right near the railroad track,—I judge it was about 1:00 o'clock on Sunday, before he was killed on Monday afternoon; so I taken him out of the mud hole and put him out on the grass." "Q. Was he able to get up that evening?" "A. Why, I don't think he did,—no, sir." The same witness testified that he had seen deceased drunk "a time or two before." From ten to fifteen minutes elapsed between the time of deceased's departure from the log camp and the time of the fatal accident at the trestle some 200 yards distant.

A corporation or company engaged in the operation of a saw mill, and operating as an incident to such business an ordinary log road or tram road for the sole purpose of transporting logs from the forest to the mills, is not a "railroad company" within the provisions of Sections 4964, 4965 and 4966, Rev. Gen. Stat. 1920. In an action to recover for injuries caused by the running of trains over such a log road or tram road the presumption of negligence prescibed by Sec. 4964, *supra*, does not apply, but recovery must be had under the rule that the burden of proving negligence is upon him who alleges it. Carter v. Arnold Lbr. Co. 83 Fla. 470; 91 South. Rep. 893; Ingram-Dekle Lbr. Co. v. Geiger, 71 Fla. 390, 71 South. Rep. 552.

Since such a company is not a "railroad company" the further provision of Sec. 4694, *supra*, that "a railroad company shall be liable for any damage done to persons * * * by the running of locomotives, cars or machinery of such company, * * * unless the company shall make it ap-

pear that their agents have exercised all ordinary and reasonable diligence  *  *  *  '' is not applicable to this case.

The liability of this defendant must be determined upon common law principles, under the ordinary rules of evidence applicable to actions for negligence, having in mind that ''while the log train of the defendant is not a railroad, it is operated by rolling stock, motive power and roadbed utilities similar to railroads, and care commensurate with the dangers incident to its operation is required by law of those engaged in its operation, the principle of *respondeat superior* being applicable as in other cases.'' In view of this similarity, logging roads have frequently been held to the same measure of responsibility and the same standard of duty as railroads, though the same presumptions and rules of evidence may not apply. Sawyer v. Roanoke R. R. Co., 58 S. E. Rep. 598; 22 L. R. A. (N. S.) 200.

A licensee has been heretofore defined by this court to be one who is neither a passenger, servant or trespasser, and not standing in any contractual relation to the railroad, and is permitted by the company to come upon its premises for his own interests, convenience or gratification. Gainesville & Gulf R. R. Co. v. Peck, 55 Fla. 402; 46 South. Rep. 1019. See also Petree v. Davison, etc. Co., 118 S. E. Rep. 697; 17 R. C. L. 566, Sec. 79. At the time of the accident, the deceased was upon the track of the defendant in pursuance of the long prevailing custom of the public in general to use defendant's track at that point as a walkway, such custom having been exercised without defendant's express authority but so openly, visibly and continuously, and by such large numbers of persons over such a long period of time, that the defendant may be said to have recognized that use after it knew, or under the circumstances should have known of it. The status of the deceased was therefore that of an implied licensee. Matthews v. S. A. L. Ry. Co., 46 S. E. Rep. 335; 65 L. R. A. 286;

Pennsylvania Ry. Co. v. Hammill, 29 Atl. Rep. 151; 24 L. R. A. 531; Thomas v. Chicago, etc., Ry., 72 N. W. Rep. 783; 39 L. R. A. 399; Jonosky v. Northern Pacific Ry., 187 Pac. Rep. 1014; M. K. & T. R. R. Co. v. Kinslow, 172 S. W. Rep. 1124.

Where such an implied license exists, the probability that person may be upon the track at that point should be more readily anticipated than in the case of mere trespass, in the light of which consideration the conduct of the defendant should be viewed. Chesapeake & Ohio R. R. Co. v. Nipp, 100 S. W. Rep. 246; Garner & Trumbull (C. C. A.) 94 Fed. 321; L. & N. R. R. Co. v. Daniel, 91 S. W. Rep. 691; 3 L. R. A. (N. S.) 1190; Morgan v. Wabash R. R. Co., 60 S. W. Rep. 195.

One operating a logging train in the manner and under the circumstances hereinabove referred to owes to an implied licensee upon its tracks the duty to exercise a reasonable degree of care and diligence, commensurate with all the circumstances, to avoid injuring him. G. F. & A. Ry. Co. v. Cox, 75 Fla. 714; 79 South. Rep. 276; Wilhelm v. M. O. & G. Ry. Co. 152 Pac. Rep. 1088; L. R. A. 1916C 1029; Williamson v. Southern Ry. Co., 51 S. E. Rep. 195; 70 L. R. A. 1007; Bennett v. Railroad Co., 102 U. S. 577; 26 Law. Ed. 235; Bridges v. Kinder & Northwest R. R. Co. (La.), 89 South. Rep. 309; 15 A. L. R. 1525. For a breach of that duty an action will lie for injuries suffered by such a licensee while in the exercise of due care for his own safety under all the circumstances. See Wade v. L. & N. R. R. Co., 54 Fla. 277; 45 South. Rep. 472; Fils v. Iberia R. R. Co., (La.) 82 South. Rep. 697.

Plaintiff below contends that the defendant failed in the performance of its duty toward the decedent in that it failed, while backing its train in the night time, to keep a reasonable lookout for persons whose presence upon its

track at the point where plaintiff's intestate was struck should have been anticipated by the defendant; that it failed to have an adequate light on the leading car of the train to give warning of its approach, and that such mosisions constitute negligence under the circumstances. Passing the question of whether or not, in view of the substantial visible and audible warnings afforded by the rear light on the engine, the sixteen blasts of the whistle and the inherent noises of the train, itself, the absence of a lookout and light on the leading car would constitute negligence, and assuming that it would, we find in the record no sufficient testimony that the flagman, or "rear end rider," at or near the time of the accident was not in fact at his proper station on the leading car, with an adequate light and keeping a proper lookout under the circumstances, the burden of proving upon which is upon the plaintiff. Nor do we find any evidence from which such fact may be reasonably inferred. From the evidence of plaintiff's own witnesses, the inference is rather to the contrary. The presumption that the deceased, in the absence of evidence to the contrary, was exercising due care and caution for his own safety because of the general instinct of self-preservation, and that he would have seen and heeded a light had there been one on the leading car, will not alone suffice to meet the burden of proving defendant's negligence or circumstances from which such negligence could properly be inferred.

We are mindful of the rule that in passing upon an assignment questioning the correctness of the ruling of the trial court in denying a motion for new trial which is based upon sufficiency of the evidence to sustain the verdict, the guiding principle for an appellate court is not what it may think the jury ought to have done or what such court may think it would have done had it been sitting as a jury in

the case, but whether as reasonable men the jury could have found such verdict upon the evidence. If this question can be answered in the affirmative, the action of the trial court upon such motion should not be disturbed. But in view of the vital deficiencies. in the evidence, hereinabove pointed out, the question in this instance, and as a matter of law, must be answered in the negative. Our view of the evidence is that in the respects stated the plaintiff has failed in his proof of the acts of negligence relied upon by him for a recovery. The judgment must therefore be reversed for a new trial. See Southern Exp. Co. v. Williamson, 66 Fla. 286; 63 South. Rep. 433; Coombs v. Rice, 64 Fla. 202; 59 South. Rep. 959; Lofton v. Jacksonville Elec. Co., 61 Fla. 293; 54 South. Rep. 959; A. C. L. R. R. Co. v. Wallace, 61 Fla. 93; 54 South. Rep. 893; also see Schultz v. Pacific Insurance Co., 14 Fla. 73, 93; Hill v. Peddy, 80 Fla. 852; 86 South. Rep. 836; Florida Trust and Banking Co., v. Consolidated Title Co., 86 Fla. 317; 98 South. Rep. 915.

Reversed.

BROWN, C. J., AND ELLIS, J., concur.

WHITFIELD, P. J., AND TERRELL AND BUFORD, J. J., concur in the Opinion.