No. 35,046

J. E. BARKER, *Appellant*, v. JOHN EBERT SEBER, *Appellee*.

(114 P. 2d 791)

Opinion filed July 5, 1941.

*Elmer E. Martin,* of Kansas City, and *Malcolm McNaughton,* of Leavenworth, for the appellant.

*Benjamin F. Endres,* of Leavenworth, for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action for damages alleged to have been sustained when plaintiff, a pedestrian, was struck by an automobile being driven by defendant. Judgment was for the defendant. Plaintiff appeals.

The plaintiff lived west of Kansas City on highway 40. This is a concrete highway composed of four traffic lanes, two on the south for eastbound traffic and two on the north for westbound traffic. Each pair of traffic lanes is twenty feet wide. The eastbound traffic lanes and the westbound traffic lanes are separated by a space of about three feet, which is not paved, and which is higher than the bed of the highway. The plaintiff lived on the north side of this highway. On the day of the injury he had been driven in a car from Topeka to his home. He had arrived at his home between six and seven p. m. on November 14, 1937. The car in which he was riding had been driven from the west a little past the driveway of his home and had pulled off the pavement and parked on the shoulder south of the slab in front of his home and stopped headed east. In order for him to reach his home it was necessary that he cross all four traffic lanes. The plaintiff was seventy-one years old. He and the young man who had driven him from Topeka walked around the rear of the car in which they had been riding. They first ap-

proached the two traffic lanes for eastbound traffic. They looked to the east and to the west; did not see any cars coming and crossed those traffic lanes and reached the unpaved portion in the middle of the highway in safety. The young man was walking to the right of the plaintiff and carrying plaintiff's grip and cane. This put the young man to the east of plaintiff. Plaintiff testified that as they looked east before they started to cross the two north traffic lanes they could not see any cars coming and started across; that when they got about halfway across the north slab the young man started to go faster; that as they got to the north edge of the north slab the young man stumbled and fell down; that just as plaintiff had one foot off the slab and the other raised to step off he was struck down; he started to get up, but his right leg was broken; he said he never did see any automobile.

On cross-examination he said that when he and the young man were two-thirds across the north side of the highway the young man started to pull him along. The young man testified that before he started into the two north traffic lanes he looked to the east from which cars would ordinarily be coming in that traffic lane, and saw no cars coming; that when he had entered the north traffic lane he did not know exactly how far he saw some headlights coming over the top of the hill; that he quickened his pace a little to get out of the way of the car; that he started running and pulling the plaintiff behind him; that he stumbled just as he reached the north edge of the pavement, not knowing the shoulder was a little higher than the pavement; that he felt the swish of a car and knew it had gone past just as they reached the shoulder.

Another young man who was in the automobile in which plaintiff had been riding testified that he saw the lights of the car coming just as plaintiff and the young man were in the north half of the highway past the center, and the car was then between five and six hundred feet east of them, just over the crest of the hill, and was bearing down on them rapidly; that there was only one car approaching from the east; he said it looked like the young man and plaintiff fell just as the car passed them. He testified that the car continued on to the west beyond the mailbox, which was west of plaintiff's driveway; that the mailbox was seventy-five feet west of where they fell; that someone picked up plaintiff's shoe about fifteen or twenty feet west of the mailbox.

The defendant testified that he was going about forty-five or fifty

miles an hour; that he was following a car that had just passed them; that there were lights on the cars coming from the west and that there were two cars he remembered coming from the west; that he never noticed anything in front of him until he was right on top of a black object that had just entered the north half of the lane, which was ten feet on the north side. He evidently meant by this the north half of the traffic lane for westbound traffic; that he applied his breaks and turned to the south. He testified as follows:

"Of course, if I would drive straight ahead like I belonged in the north half in my driving lane, why, I would hit whatever it was head-on with the front of the car. As it was I hit it with the, or something hit the rear fender of the car. . . ."

He also testified—

"Of course, they were—oh, I would say four or five feet from the dividing line in the center of the north lane toward the center of the north—that is where I first noticed this black object."

A verdict was returned for the defendant. Twenty-eight special questions were answered by the jury. Motion for new trial was filed and denied. Plaintiff has appealed.

Plaintiff argues that the trial court erred in giving the following instruction:

"3. In this case, the evidence shows beyond dispute, in fact, it is conceded by both the plaintiff and defendant, that J. E. Barker, the plaintiff, started to cross over the north lane of highway 40, from south to north, at a point other than a marked cross-walk, and it is the law of Kansas that a pedestrian crossing a public roadway at a point other than a marked cross-walk shall yield the right of way to all vehicles upon the roadway, and the driver of an automobile has a right to rely upon it that a pedestrian will obey the law and yield the right of way to him and as he approached; if you find from the evidence in this case that the plaintiff was being assisted by one Charles Sessions, Jr., in crossing said highway at a point other than within a marked cross-walk, and before crossing or while in the act of crossing over said highway, they, or either of them, observed a motor car approaching from the east, and toward the point where they were crossing, it was their duty to stop and yield the right of way to the approaching vehicle, and for them or either of them to fail to do so, under the circumstances testified about in this case, would be a violation of the law of Kansas and negligence on the part of the plaintiff."

The plaintiff argues that this instruction took the question of whether the defendant was guilty of contributory negligence under all the circumstances in this case away from the jury. It should be noted that the only evidence as to lights of an approaching car from the east was given by the witness who testified that it was five or six

hundred feet away. The jury found, in answer to a question, that the young man looked to the east before they started into the north lane and that they saw the headlight of an automobile approaching from the east when they were about five feet north of the south edge of the north traffic lane. This would make them about one-fourth of the way across this twenty-foot traffic lane.

In answer to the next question, the jury found that at the time he saw this car approaching from the east it was between five and six hundred feet away and being driven at the rate of between forty-five and fifty miles an hour.

The jury in answer to other special questions found that the proximate cause of plaintiff's injury was his own negligence and that the evidence did not show conclusively that the car of defendant struck plaintiff. The jury also found that the young man with plaintiff looked to the east before starting to cross the north slab and there was no car in sight at the time they started across.

The instruction of which complaint is made was given pursuant to G. S. 1939 Supp. 8-557. That section is part of chapter 283 of the Laws of 1937. This chapter is a comprehensive treatment of the subject of traffic control within incorporated cities as well as on highways outside of cities. The section provides as follows:

"(a) Every pedestrian crossing a roadway at a point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right of way to all vehicles upon the roadway. (b) Any pedestrian crossing a roadway at a point where a pedestrian tunnel or overhead pedestrian crossing has been provided shall yield the right of way to all vehicles upon the roadway. (c) Between adjacent intersections at which traffic-control signals are in operation pedestrians shall not cross at any place except in a marked crosswalk. (d) Notwithstanding the provisions of this section every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway, and shall give warning by sounding the horn when necessary, and shall exercise proper precaution upon observing any child or any confused or incapacitated person upon a roadway."

There is a serious question as to whether this particular section was intended to apply to a person crossing a highway out in the country where everybody knows there are no marked crosswalks for miles. However, we do not need to decide that question here. The only question we have is whether the statute applied to the circumstances in this case.

The first part of the instruction is but little more than a statement in general terms of what the section provides.

The first language of the instruction which we shall examine is as follows:

"If you find from the evidence in this case that the plaintiff was being assisted by one Charles Sessions, Jr., in crossing said highway at a point other than within a marked cross-walk, and before crossing or while in the act of crossing over said highway, they, or either of them, observed a motor car approaching from the east, and toward the point where they were crossing, it was their duty to stop and yield the right of way to the approaching vehicle, and for them or either of them to fail to do so, under the circumstances testified about in this case, would be a violation of the law of Kansas and negligence on the part of the plaintiff."

There is no dispute whatever in this record but that plaintiff was being assisted; that there was no marked crosswalk, and that while in the act of crossing they saw a motor car approaching from the east toward the spot where they were crossing. The jury was bound to find that these facts existed. But where were plaintiff and his companion in the highway when they saw the car approaching?

The plaintiff testified on this subject as follows:

"When we got about one-half way across the north slab, Mr. Sessions speeded up. I was holding his arm and he took me along with him."

This would put plaintiff and his young companion with ten feet each way to go to reach a safe place. Later he testified:

"When Mr. Sessions and I got about two-thirds across the north side of the highway, he pulled me along."

This would put him in a little nearer to the north side, where he was hit, than to the south side.

The young man testified as follows:

"When we got into the (north) road I don't know exactly how far, I saw some headlights coming over the top of the hill. I quickened our pace a little to get out of the way of that car. It became apparent that the car was traveling at a high speed. I started sort of running and pulling Mr. Barker behind me."

The young man who had come along and stayed in the car testified as follows:

"Then I saw a headlight from a car to the east. I turned to see if the car was close to them or where it was. When I first saw the headlights they were some place in the north half of the highway past the center place and the car was then between five and six hundred feet east of them just over the crest of the hill, and the car was bearing down on them rapidly. Sessions had started to hurry."

The statement "Sessions had started to hurry" should be noted. The foregoing is all the evidence there was on the part of the

plaintiff as to where plaintiff and his young companion were when the approaching car was first seen by them. The statement of plaintiff, first, that they were half way across and then that they were two-thirds of the way across, is the only positive evidence on that point. The plaintiff was entitled to have the case submitted to the jury for it to determine as a question of fact these two important points.

The testimony of the defendant is interesting on this question. He testified as follows:

"The lights of one was passing just about to the top of the hill towards the entrance to Mr. Barker's residence and of course I never noticed anyone in front of me, or anything until I was right upon top of the black object in front of me, which was in the lane in front of me there right about—just entered the north half of the lane which was ten feet of the north side. Of course, they were—oh, I would say four or five feet from the dividing line in the center of the north lane toward the center of the north—that is where I first noticed this black object. Of course, I applied my brakes and turned my car to the south."

This statement is not as clear as it might be, but apparently by his use of the words "four or five feet from the dividing line in the center of the north lane" and "just entered the north half of the lane which was ten feet of the north side" he meant to state that when he first saw plaintiff he was within five feet of the north side of the highway and safety. This agreed fairly well with the other evidence.

After this critical examination of the testimony it appears that if the theory of the defendant as to the instruction is correct the trial court might have said, if you find from the evidence that when plaintiff and his young companion were within five feet of the north side of the highway where plaintiff was struck and they saw a motor car 500 or 600 feet away approaching them in a two-lane highway, it was their duty to stop and yield the right of way to the approaching vehicle, and for them, or either of them, to fail to do so, under the circumstances testified about in this case, would be a violation of the laws of Kansas and negligence on the part of the plaintiff.

Such construction would mean that every pedestrian would cross a country road at his peril. What good would it have done them to stop? No matter where they were in the highway, by stopping they would have made themselves a target for the oncoming automobile. It is hard to see how they would have helped themselves by standing still even had they been only five feet from the south side of the two westbound traffic lanes. Then what does "yield the right of

way" mean? By this instruction on account of using the word "stop" with that phrase the jury was given to understand that it would have been negligence for the plaintiff to do anything else but stop. The question of whether the plaintiff did what the ordinary reasonable man would have done under the circumstances was for the jury. When they saw the car coming 500 or 600 feet away they hurried to get out of the highway into a place of safety. Suppose they had only been five feet from the south side of two westbound traffic lanes, if they dodged back to the middle of the highway when they saw a car 500 feet away, then they would have been compelled to try it the next time. Suppose they would get out into the middle then and see a car coming 500 feet away, should they have dodged back, stood still or kept on going as best they could? Is a pedestrian in such a situation to be held to such a strict rule as to what his conduct should be under the circumstances? Such a construction would mean that a pedestrian who should find it necessary to cross a country road would have to possess the agility of a college halfback and have the perception of distance and speeds of a newly created sergeant of infantry. This court does not care to approve any such rule with reference to the traffic upon the highways of the state. (See *Scheve v. Heiman,* 142 Kan. 370, 47 P. 2d 70.) Under all the surrounding facts and circumstances of this case there was no occasion for the instruction to be given.

Defendant makes a point that the plaintiff is not entitled to urge the giving of this instruction as error in this court on appeal because he did not offer any instruction to cover the subject in general. This record discloses, however, that this instruction was excepted to by plaintiff and that the attention of the court was called to it. Under such circumstances it appears the trial court was advised that this instruction was not satisfactory to the plaintiff.

It is true that the jury in this case, in answer to special questions, found that the proximate cause of the injury to plaintiff was his own negligence and that the defendant was not driving at a rate of speed greater than was reasonable and prudent under the conditions that existed. However, these answers must be considered in connection with the instructions we have discussed. The jury might well have answered the question as to the proximate cause of the injury being the negligence of plaintiff because it had just been told in effect that he was guilty of negligence in not stopping when he saw the car 500 feet away.

The judgment of the trial court is reversed, with directions to grant the plaintiff a new trial in accordance with the views herein expressed.