No. 36,894 and No. 36,995

JOSEPH F. KNIFFEN, *Appellee* and *Cross-appellant*, v. HERCULES POWDER COMPANY, and LOUIS MIZE, *Appellants*.

(188 P. 2d 980)

Opinion filed January 24, 1948.

*Blake A. Williamson,* of Kansas City, argued the cause, and *James K. Cubbison* and *Lee Vaughan,* both of Kansas City, were with him on the briefs for the appellants.

*Leonard O. Thomas,* of Kansas City, argued the cause, *Arthur J. Stanley, Arthur J. Stanley, Jr., J. E. Schroeder, Lee E. Weeks,* all of Kansas City, and *George W. Meyer,* of Kansas City, Mo., were with him on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action to recover damages to property and for injuries to a person resulting from a collision between an automobile and a railroad engine operated by the Hercules Powder Company.

The defendants are Hercules Powder Company and Louis Mize, its engineer of a Diesel engine. The defendants and the plaintiff have both appealed. The first appeal by the defendants is from (1) an order overruling their joint general demurrer to plaintiff's evidence; (2) the order overruling their motion for judgment on the pleadings and opening statement; and (3) the order overruling their motion for directed verdict.

No final judgment has been rendered. The trial court sustained defendants' motion for a new trial. Plaintiff filed no motion for a new trial but has cross-appealed from the order granting defendants' motion for new trial and in his cross-appeal endeavors to have certain alleged trial errors reviewed. Subsequent to the filing of that cross-appeal defendants have cross-appealed and seek to have certain alleged trial errors reviewed in addition to the order overruling the demurrer to plaintiff's evidence.

Before proceeding with a discusion of the ruling on the demurrer we shall state the issues joined by the pleadings.

Plaintiff's petition was based not only on the alleged negligence of defendants but also on the alleged reckless and wanton conduct of the engineer. Defendants' answer likewise charged plaintiff with negligent, reckless and wanton conduct. After all evidence of the parties was introduced and they had rested, plaintiff, in response to defendants' instant and previous motion, elected to abandon the negligence theory and to stand on the theory of the engineer's reckless and wanton conduct. However, prior to such election and at the time defendants lodged their general demurrer to plaintiff's evidence the issues were those previously stated. If only negligence of defendants and contributory negligence of the plaintiff had been alleged it, of course, would have been only necessary for the evidence to show defendants' negligence and lack of plaintiff's contributory negligence in order to establish a cause of action. Plaintiff, however, does not attempt to uphold the ruling on such a theory but insists the ruling was correct by reason of (1) defendants' wanton conduct, and (2) the absence of wantonness on plaintiff's part. The reason for plaintiff's contention appears obvious as contributory negligence, if it existed, is not a defense to wantonness. (*Railway Co. v. Carlson,* 58 Kan. 62, 48 Pac. 635; *Railway Co. v. Baker,* 79 Kan. 183, 98 Pac. 804; *Jacobs v. Railway Co.,* 97 Kan. 247, 253, 154 Pac. 1023; *Frazier v. Cities Service Oil Co.,* 159 Kan. 655, 157 P. 2d 822; *Elliott v. Peters,* 163 Kan. 631, 636, 185 P. 2d 139.)

Wanton conduct of a plaintiff is, however, a defense to a defendant's wantonness. (Restatement, Torts, vol. 2, § 503.) 4 Blashfield's Cyc. Automobile Law & Practice states:

"In the absence of statute, it has been held that a plaintiff who is guilty of willful or wanton conduct, which contributed to his injury, cannot recover, although defendant was guilty of willful or wanton conduct also." (§ 2776.)

We shall now consider the order overruling defendants' demurrer. It is, of course, elementary that in doing so all of the evidence is admitted to be true and only the evidence most favorable to the plaintiff is considered.

In order to avoid confusion we shall continue to refer to the parties as plaintiff and defendants and shall refer to the separate defendant, Hercules Powder Company, as Hercules.

The material portions of plaintiff's evidence, in substance, disclosed:

Hercules was engaged in the manufacture of powder, dynamite and other explosives and operated, maintained and controlled a large plant, known as the Sunflower Ordnance Works, near De Soto, Kan., for the manufacture of such explosives; in connection therewith it maintained and operated a railroad on the premises for the transfer of commodities and goods in and about the plant; it also maintained a certain highway known as Springtown road which extended in a southerly direction from state highway No. 10 and led through and near the plant; Springtown road intersected the railroad at three places; the defendant Mize at all times in question was an employee of Hercules and as such operated a Diesel engine on the railroad moving cars at the direction of Hercules; the Sunflower Ordnance Works was divided into areas, one known as the vital area where explosives were manufactured and the other as the outside area; the vital area was fenced; all areas were patrolled by Hercules guards including the Springtown road over which the railroad passed and where the accident in question occurred in the outside area; Hercules controlled the speed of automobile and railroad traffic within the entire area.

Other material portions of plaintiff's evidence, in substance, disclosed:

Facilities of the plant were being extended by the construction of additional buildings; the construction work was being done by Wm. S. Lozier, Inc., Broderick and Gordon; the plaintiff was one of its employees and on the date of the accident, January 31, 1945, was

employed at the job haul office; he had driven over the crossing in question since the middle of the summer in 1943; plaintiff's employer had between five and six thousand persons working on construction jobs at the time; practically all of them used the same crossing when coming to work between the hours of 7:00 and 8:00 a. m.; they used the same crossing when returning home at the end of the shift; many materials and supplies were also transported over the same crossing; on the morning of the accident plaintiff was hauling four other employees in conformity with the "share-the-ride" program; under that program cars averaged about four passengers each; owing to the traffic congestion the guards insisted that all cars keep moving; the distance between the cars was very short and sometimes they moved bumper to bumper; the drivers had been warned to keep their eyes on the car ahead of them in order to avoid striking it; on the morning of the accident there was a continuous stream of cars ahead of plaintiff's car and there were cars to the rear; a pickup truck was immediately in front of plaintiff's car; George Staton worked for the construction company on the man-haul job; he and Everett Bigler were in the truck; plaintiff's car was approximately one car length behind the truck; it was dark but getting daylight; all the drivers were using their car lights; the lights shone against the car in front; there were border lights around the area; they looked like street lights around the buildings; you could not differentiate between the light on the locomotive and the border lights; there was no difference in the height of the light on the locomotive and the border lights as you looked down the road; Staton had heard no bell or whistle and had seen no locomotive; he first saw the locomotive when he was on the railroad track; it was then about ninety feet away; his truck cleared the track and the locomotive passed right behind it; the locomotive light was not shining across the road in front of the automobile traffic; from April, 1944, to the present occurrence Staton had never seen the locomotive cross the road at that time; he checked in at his work place at 7:30 a. m. in order to get his men on their jobs by 8:00 a. m.

Other material portions of testimony offered on behalf of plaintiff were:

The speed of the locomotive was between forty-five and fifty miles per hour; Bigler, who was driving the pickup truck, in substance, testified: The traffic was heavy that morning and the cars were traveling bumper to bumper; he looked to the east and to

the west before he drove onto the crossing; he saw no train and heard no whistle or bell; he looked to the west while on the crossing and saw the train; the headlight on the engine was like an amber street light; the only thing to confuse your vision to the west was the street lights along the patrolled road; the lights confused your vision as you looked to the west; he was in the middle of the track when he first saw the train and thought it was probably fifty or sixty feet to the west; he was driving about twenty miles per hour.

J. F. Jackson, one of plaintiff's witnesses, in substance, testified:

He rode with a Mr. Filbert on the morning in question and was in the rear seat; he did not see the locomotive or hear any whistle; it was quite dark; you could see a line of cars ahead but you couldn't distinguish much in the fog; they were probably seventy-five to eighty feet from the impact and probably one to two car lengths behind the car in front of them; he thought they were the third car behind plaintiff's car.

Leonard Roberts, a witness on behalf of plaintiff, testified, in substance:

He had been employed at the Sunflower Ordnance Works from 1942 until April 25, 1945; he was last employed as a job steward for the steam-fitters' union; the job stewards attended to grievances of employees belonging to their craft; he worked between 8:00 a. m. and 4:30 p. m. and was required to cross the Springtown road; a short time after January 7, 1944, complaints were made to him by the steam fitters relative to switch engines pulling cars of material in and powder out over the Springtown crossing while they were entering for work and thus delayed them in reaching their place of work in time; they would be "docked" for time lost by reason of no fault of their own; those men generally went to work from 7:30 to 8:00 a. m. while it was dark; there were five or six thousand workmen averaging four to a car; a train passing through there was a very unsafe factor; about four to six stewards went to Mr. Tuttle, personnel director of the plant for Lozier, Broderick and Gordon, and complained about trains blocking the crossing; Mr. Tuttle called Major Mathews of the army engineers by telephone and inquired whether he had the safety department of Hercules; Mr. Tuttle advised whomever he was talking to of the complaints; after he finished his telephone conversation Mr. Tuttle told them the trains would no longer use the track during the

periods they were going to work and going home from work; the witness (Roberts) communicated that information to his men; he customarily used plaintiff's truck in hauling men around the plant; plaintiff was the driver; plaintiff had previously told him about engines crossing the road and he (Roberts) advised plaintiff about the conference with Major Mathews; after registering the complaint he never noticed a locomotive or train cross the Springtown crossing.

Kenneth D. Kinnison, a witness for plaintiff, testified, in substance:

He was employed by Lozier, Broderick and Gordon in 1942 and continued with them until March, 1946; this covered the entire period of construction at the Sunflower Ordnance Works; his employment was that of job-haul superintendent; he was in charge of all moving of materials, unloading of railroad cars and trucking on the job in line with construction work; he was in charge of the man-haul department which provided transportation for the employees to be taken to the different areas for their work; the route for the entrance and departure of such employees was over the Springtown crossing and was specified by Hercules; plaintiff was one of his truck drivers; his men were required to be on the job by 8:00 a. m. and some as early as 7:30 a. m.; the number of men who used the Springtown crossing between 7:00 and 8:00 in the morning in January, 1945, was around five thousand; there was a continuous line of traffic from 7:00 to 8:00 in the morning; the cars were close to each other; they were working on daylight-saving time and it was dark; the guards used flashlights for identification purposes; traffic directives originated with and were under the supervision of Hercules; directives were sent to the commanding officer, the resident engineer for the army ordnance, army engineers, and probably one to the project manager for Lozier, Broderick and Gordon; (the witness was handed a directive dated April 4, 1944, addressed "To all concerned" which came from the office of John C. Marshall. This directive was effective April 10 and the material part thereof directed that all crossings throughout the plant, outside the limitation of the classification yard, during shift changes be cleared of engines twenty minutes before change time and twenty minutes after change time); the foregoing was one of the directives he received from John C. Marshall, Hercules superintendent of transportation; the directives he had received were now destroyed; he recalled receiving a directive applying to the Springtown road

crossing before the accident but could not remember the specific date; it was probably a year prior to the accident on January 31, 1945; to the best of his recollection it required the crossing to be kept free from trains from 7:00 or 7:15 to 8:00 a. m.; that directive was posted on the bulletin board at his office where notices generally appeared and could be read; he entered over the crossing between 7:15 and 8:00 a. m.; since receiving the directive to which he referred, which required the crossing to be kept clear from 7:15 to 8:00 a. m., he had seen no train at the crossing; the witness was handed defendants' exhibit No. 2 which was as follows:

"February 23, 1944.

"MEMORANDUM

"*To:* T. B. Primrose
 K. C. Glasscock
"*From* John C. Marshall

"Whenever it is possible to do so, please see that the engine is not on the track at Stringtown road between 7 and 8 a. m. When it is absolutely necessary, this rule may be violated but, as far as possible, live up to same so that we will not have the road blocked while construction employees are reporting for duty.

"JCM:vh"

The witness (Kinnison) stated that to the best of his recollection he had never seen that directive. The directive he received might have shown the same date but he was not certain of the date.

Leonard O. Thomas, one of the attorneys for plaintiff, testified concerning the effort to obtain copies of all directives issued by Hercules, as follows:

"A subpoena was issued at request of plaintiff, by the Clerk of the District Court, to Miss Graham and Mr. Sorrenton, for the production of records of Lozier, Broderick and Gordon, returnable to this court. Mr. Sorrenton informed counsel of hundreds of boxes of records involved and a complete examination would take considerable time, many weeks, and asked counsel to specifically point out document requested. In company with *Mr.* Graham, Mr. Sorrenton's assistant, counsel went to Topeka and in *Mr.* Graham's presence, investigated the books dealing with the traffic department and any other department that had any relation to this subject in which Miss Graham had charge of the records. No directives issued by Hercules pertaining to the Springtown Road crossing could be found and Miss Graham could not suggest any other place they might be. All likely places were investigated.

"*Cross-Examination*

"I judge we looked in about 15 books. I don't recall there was a box named 'project manager.' I don't think Miss Graham knew of any such book. In my presence she went through the book in which all files were listed and couldn't find any file where this sort of thing would be listed."

Material portions of plaintiff's own evidence, in substance, was:

Eight or ten months before the accident he had a conversation with Mr. Kinnison, his boss, who was superintendent of the job-haul cars; he complained to Kinnison about the danger of using the Springtown crossing with trains going over it; Mr. Kinnison said he would take the matter up with the safety department and later advised him he had gotten the matter settled and that plaintiff would no longer be bothered about trains on the Springtown crossing; after that he never saw a train crossing during the hours he went to work; Mr. Roberts, whom he hauled about the grounds, also informed him he had taken the matter up with Mr. Tuttle and that there would be no more trains over the crossing during shift periods; he went over the track the morning of the accident in time to reach his work by 7:30; he was traveling between fifteen and eighteen miles per hour at the crossing; his lights and brakes were good; he could see through his windshield; on a previous occasion he had been pulled out of the line of traffic and the guard had told him to keep the line moving, to keep close up and not stop, to keep moving and that if he stopped the man behind him would probably slide into him; as he approached the crossing that morning he could have stopped within about ten or fifteen feet; there was a long string of cars behind him; there was a half-ton pickup Willys truck just ahead of him; he heard no whistle and no bell; there were four others in his car in accordance with the "share-the-ride" program; the traffic line was moving fifteen or eighteen miles per hour; to the best of his judgment there was a space of ten or fifteen feet between him and the car ahead of him; he didn't listen for a whistle or bell or look for any light on any train; he was on the tracks when he was hit; it couldn't be possible that he ran into the side of the train; he did not look out of the side windows.

Defendants' demurrer to plaintiff's evidence, of course, searches that evidence. Any lack, however, in plaintiff's evidence to establish a cause of action is cured if the defendent later supplies the deficiency. (*Lechleitner v. Cummings,* 159 Kan. 171, 152 P. 2d 843, and cases therein cited.) Plaintiff directs our attention to testimony of defendants' witness, the fireman on the involved Diesel engine, who admitted there was great danger at the Springtown crossing from 7:00 to 7:30 in the morning and that he knew such danger existed. The defendant engineer, Louis Mize, in substance, testified in part: He had operated at this crossing since 1942; he had a clear

view to the east and to the north (plaintiff's car was coming from the north) ; the engine was operating backward that particular morning; it operated and pulled equally as well one way as the 'other; he noticed a pickup truck as he approached the crossing when he was about 250 feet west of the crossing and observed other cars on the highway to the north of the crossing, breaking over the top of the hill, which was 780 feet from the crossing; there were no other cars between those cars and the pickup truck; the space between the cars was around 700 feet; plaintiff's car was from fifty to seventy-five feet from the engine as it went into the intersection and struck the engine twenty feet back from its front corner; the operation of the brakes was cut and the engine was stopped by the hand brake about 250 feet below the crossing.

Should the demurrer to plaintiff's evidence have been overruled? At the outset it is well to observe defendants rely heavily on certain directives which they contend denied them the right to run trains over the Springtown crossing only during a period twenty minutes before and twenty minutes after a shift hour for employees and on another directive which permitted trains on that crossing between the hours of 7:00 and 8:00 a. m., but only when absolutely necessary. The hour of 8:00 a. m. was a shift period and this accident occurred before twenty minutes of eight. While some of plaintiff's witnesses were interrogated concerning certain traffic directives on cross-examination, on which directives defendants rely, such directives appear to have been introduced as a part of defendants' case and are not a part of plaintiff's case in chief. Although the record before us is not entirely clear in all instances as to precisely what portions of oral testimony of plaintiff's witnesses were admitted with respect to the claimed substance of directives on which plaintiff relies, but which could not be found, we have narrated only some portions of that testimony which we consider competent under the issues.

The fee title to land on which the accident occurred, including thousands of acres of other land, was acquired by the United States government in 1942. All laws of this state and decisions of this court affecting the right of parties to this action rendered prior to such acquisition of title remain in effect until abrogated. (*Herken v. Glynn*, 151 Kan. 855, 866, 867, 101 P. 2d 946.) We are advised of no changes that the congress has made in the applicable law. Decisions of this court cited herein and rendered subsequent to the

date of acquisition of such territory are in harmony with those previously rendered.

Did plaintiff's evidence establish wanton conduct on the part of the defendant engineer? Degrees of negligence have been abolished in this state. (*Railway Co. v. Walters*, 78 Kan. 39, 96 Pac. 346; *Frazier v. Cities Service Oil Co.*, supra, p. 664.) Wantonness is distinct from negligence and differs in kind. (*Railway Co. v. Baker*, supra, p. 189; *Koster v. Matson*, 139 Kan. 124, 30 P. 2d 107; *Elliott v. Peters*, supra, p. 636.) While wantonness has been defined with slightly varying terminology a sufficiently inclusive definition is contained in *Frazier v. Cities Service Oil Co.*, supra, as follows:

"To constitute wantonness, the acts complained of must show not simply lack of due care, but that the actor must be deemed to have realized the imminence of injury to others from his acts and to have refrained from taking steps to prevent the injury because indifferent to whether it occurred or not. If the actor has reason to believe his act may injure another, and does it being indifferent to whether it does or not, he is guilty of wanton conduct." (Syl. ¶ 5.)

See, also, *Elliott v. Peters*, supra, and cases therein cited and *Srajer v. Schwartzman*, No. 36,969, *post* p. 241, this day decided.

Defendants stress *Leabo v. Willett*, 162 Kan. 236, 175 P. 2d 109, in which it was held:

"In order to render the operator of a vehicle liable in damages under our guest statute his conduct must be such as to denote conscious or intentional misconduct from which injury to someone is likely to result and with a reckless disregard of such consequence." (Syl. ¶ 1.)

Defendants contend wantonness involves a mental attitude of the actor and is therefore to be distinguished from mere negligence. That is true as already indicated. Defendants' contention applied to the instant facts is that plaintiff's evidence did not disclose the engineer discovered in time that plaintiff's peril was imminent and hence there could have been no conscious or intentional misconduct. The contention undoubtedly would have great merit as applied to *defendants'* evidence which disclosed a wholly different situation from that established by plaintiff's evidence. The question on demurrer, however, is whether *plaintiff's* evidence was sufficient to take the case to the jury on the issue whether the engineer had reason to believe danger of injury to another was imminent if he negotiated the crossing and that he did so whether it injured someone or not. If reasonable minds might reach different conclusions on that question it was the province of the jury to resolve it under proper instructions. (*Railway Co. v. Carlson*, supra.)

The jury had a right to believe: Hercules designated the place for employees with vehicles to cross the tracks; it patrolled the roadway; no watchman was stationed at the crossing; there was a continuous line of traffic over this crossing with the vehicles in close proximity to each other and that was true the morning of the accident before twenty minutes of eight o'clock; the light on the engine was dim; owing to other lights on the premises the engine could not be noticed approaching; traffic rules required automobiles to keep moving and it was a violation of such rules for them to stop in the line of traffic; the engineer could see the automobile traffic passing over and approaching the crossing when such traffic was 780 feet from the crossing and while the engine was 250 feet from the crossing; no trains would be encountered at the crossing while employees were entering to go to work; the maximum speed limit for trains was twenty miles per hour; the engine negotiated the crossing between forty-five and fifty miles per hour.

The jury could conclude that negotiation of the crossing with a train or engine, under such circumstances, involved imminent peril to someone and that the engineer while conscious of such fact passed over it with indifference to consequences.

Assuming, however, defendants were permitted to run a train over the crossing between 7:00 a. m. and twenty minutes of eight, if they exercised reasonable care, plaintiff's evidence nevertheless established at least a prima facie case of wantonness. Such proof required the trial court to submit to the jury the question of the engineer's consciousness of the imminence of danger and his disregard of the consequences. (*Railway Co. v. Carlson*, supra; *Railway Co. v. Baker*, supra, pp. 187, 188; *Frazier v. Cities Service Oil Co.*, supra.) So in the Carlson case, where children coming from school crossed a railroad track, it was said:

"A motorneer in charge of a street car may not lawfully propel it into a crowd of children, or of grown people either, at such rate of speed as to seriously endanger persons on or about the track. It would be difficult to conceive a more reckless act than that of driving a street car at the rate of twelve miles an hour into a swarm of school children just as they are leaving school. This would be so even if the bell were continuously sounded. In this case, it appears that the bell was rung at the alley, about 150 feet away from the boy, but several of the children, who were near him, testified that they did not hear it." (p. 64.)

Also, in the Frazier case, *supra*, following the celebrated Baker case, *supra*, the court said:

"In *Railway Co. v. Baker,* 79 Kan. 183, 98 Pac. 804, 21 L. R. A., n. s., 427, it was said that misconduct of the engineman on a railroad train might amount to recklessness and wantonness so as to cut off the defense of contributory negligence, *although they did not know of the presence of the person injured,* if to their knowledge the extent to which a certain street was used made an injury so probable they must be deemed to have realized its imminence and to have refrained from taking steps to prevent it because they were indifferent to whether it occurred or not." (Our italics.) (p. 664.)

Was plaintiff guilty of wanton conduct under the evidence adduced in his behalf? Defendants contend he was and assume plaintiff's duties to stop, look and listen were those imposed by the railroad crossing law as laid down in our decisions. No authority is cited to support the assumption. This accident occurred at a crossing operated and controlled as a private rather than as a public traffic-way. The defendant, Hercules, was responsible for patrolling the entire ground, both inside and outside the vital area. The same defendant designated this place for plaintiff and other employees to cross the railroad switch track. This railroad was not a commercial railroad or a public carrier of property or passengers. The term "railroad" standing alone ordinarily refers only to ordinary commercial railroads for the transportation of freight and passengers, as distinguished from a private tramway or railroad used only in the conduct of another business. (51 C. J., Railroads, § 1.)

"The term 'railroad,' as generally employed, relates to highways or roads constructed by the authority of the state, with fixed metallic rails upon which public carriers may propel their carriages or cars speedily in the transportation of passengers and freight." (22 R. C. L., Railroads, § 3.)

For broad scope of term "railroad" and distinctions in use of term see 44 Am. Jur., Railroads (§§ 3, 8, 9). For Treatment of a related subject see, also, *J. Ray Arnold Co. v. Carter,* 91 Fla. 548, 108 So. 815, and anno. in 46 A. L. R. 1076.

In *Bunton v. Railway Co.,* 100 Kan. 165, 163 Pac. 801, it was stated:

"The trains must be operated with dispatch. The public demands that service; and that this may be done, the duty to avoid getting run into at a railroad crossing in the open country is chiefly imposed upon the person who seeks to cross the railroad track—not out of regard for the railroad company, *but because expedition of railroad operation is exacted by the public* at the hands of the railroad company." (Our italics.) (p. 169.)

Defendants' Diesel engine had no schedule to maintain in furtherance of the public service or welfare. The expedition with which commercial railroad operations are demanded by the public did not

obtain in the instant case and that fundamental reason for the particular care required of persons crossing its tracks is lacking here. Where obvious reasons for a rule do not exist unqualified adherence to the rule should not be exacted. Manifestly, plaintiff was required to exercise reasonable care for his own protection under the circumstances including the existence of the tracks, signs and every other material factor. Whether under traffic directives defendants actually had the right of way became a matter of defense. But assuming for the moment defendants are right about what the traffic law required and that plaintiff believed it to be otherwise, plaintiff's violation of the rule, under such circumstances, might have constituted negligence but not necessarily wantonness. Without laboring the point we have no hesitancy in concluding the question of plaintiff's wanton conduct, as well as that of the defendant engineer, was a jury question.

Defendants argue the trial court erred in overruling their motion for judgment on the pleadings and opening statement. It is urged the petition did not charge the engineer willfully and consciously intended to injure the plaintiff. The petition was sufficient in that regard if it alleged wanton conduct towards anyone. It was not necessary the precise words "willfully" and "consciously" should be employed. The test is whether the facts alleged disclosed the essential elements of wantonness. (*Frazier v. Cities Service Oil Co.,* supra, p. 664.) Defendants contend the written traffic directive attached to and made a part of their answer was not denied under oath and was, therefore, admitted. Failure to make such a denial admitted only the instrument was executed (G. S. 1935, 60-729) and not that it was the only directive executed or that it superseded all others.

In view of what has been said on the subject of wanton conduct we think it unnecessary to comment on defendants' motion for a directed verdict interposed at the conclusion of the introduction of all the evidence. We think the last two mentioned motions and defendants' demurrer to plaintiff's evidence were properly overruled.

This brings us to plaintiff's cross-appeal from the order sustaining defendants' motion for a new trial. It clearly appears from the record defendants' motion was sustained for the reason the trial court believed it erred in failing to give the substance of a certain portion of two instructions requested by defendants, which, by reason of a change in other instructions, was omitted in the final draft. When the matter was presented on the hearing for a new trial it

appears the trial court did not approve the requested instructions in their entirety but was convinced they were sufficient to call the court's attention to some of the law involved and to require the court to state the law on such subject correctly.

Under similar circumstances it has been held the court was sufficiently advised that an instruction was not satisfactory to the complaining party. (*Barker v. Seber*, 154 Kan. 24, 30, 114 P. 2d 791; *Waugh v. Kansas City Public Service Co.*, 157 Kan. 690, 700, 143 P. 2d 788.) In the instant case the trial court said:

"The Court's failure to give the instruction of the defendants' right to rely on the assumption that the plaintiff, apparently being in full possession of his senses, would obey the law and would exercise ordinary care and caution in the operation of his vehicle, in substance, as set forth in defendants' requested instructions 3 and 4, was error, and requires the granting of a new trial upon the issues."

Plaintiff argues the requested instructions did not constitute a correct statement of the law as applied to the facts in this case. That may well be true and the trial court suggested as much but the trial court was satisfied a portion thereof should have been given, at least in substance.

Plaintiff reminds us defendants' requested instructions were not signed as required by G. S. 1935, 60-2909, and that such failure precludes them from complaining that they were not given, citing *Malone v. New York Life Ins. Co.*, 148 Kan. 555, 83 P. 2d 639. In that case part of the instruction requested was included in those given. In the instant case the court, in fairness to defendants, felt obliged to grant a new trial. It clearly appears that notwithstanding the requested instructions were not signed they were plainly identified by the title, "Instructions Requested by the Defendants." The trial court remembered defendants had requested the instructions and plaintiff was in nowise misled or prejudiced by the lack of signature. Under these circumstances we shall not reverse the trial court for granting a new trial.

Plaintiff next argues failure to give the instructions, if error, was cured by the findings of the jury. That may be true in some circumstances. Here the trial court apparently was not convinced that was true. Ordinarily answers by a jury must be considered in connection with the instructions to the jury. (*Barker v. Seber*, supra, p. 30.)

On plaintiff's cross-appeal he also urges the court committed other trial errors. No final judgment has been rendered. Defend-

ants object to a review of the alleged errors as plaintiff filed no motion for a new trial. Plaintiff counters by stating he prevailed and, therefore, desired no new trial. A party's right to be heard on review under similar circumstances has received our attention in *Walker v. S. H. Kress & Co.*, 147 Kan. 48, 75 P. 2d 820, and *Rusch v. Phillips Petroleum Co.*, 163 Kan. 11, 21, 180 P. 2d 270. In the instant case it is sufficient to say plaintiff's cross-appeal was expressly limited to the single question whether the court properly sustained defendants' motion for a new trial. That question has been treated. Plaintiff's cross-appeal included none of the other alleged errors of which he now complains and he is not entitled to a ruling thereon.

Following the cross-appeal by plaintiff from the order sustaining defendants' motion for a new trial defendants cross-appeal from certain other alleged trial errors. Assuming such questions are properly here on that appeal counsel for defendants seek to have them reviewed only in the event this court reinstates the verdict of the jury. Having sustained the order granting a new trial the general verdict is not reinstated and nothing further need be said concerning defendants' cross-appeal.

The judgment is affirmed.