MABEL A. DAVIS, Administratix of the Estate of FRANK A. DAVIS, Deceased, Appellant, v. J. E. WYATT, Respondent, No. 41225— 224 S. W. (2d) 972.

Division One, November 14, 1949.

Motion for Rehearing or to Transfer to Banc Overruled, December 12, 1949.

964

Arthur C. Popham, Arthur C. Popham, Jr., Sam Mandell and Harold A. Lockhart for appellant; Popham, Thompson, Popham, Mandell & Trusty of counsel.

Henry W. Buck, W. H. Hoffstot, Jr., Martin J. Purcell and Morrison, Nugent, Berger, Hecker & Buck for respondent.

BRADLEY, C.—Action by Frank.A. Davis for damages for personal injuries; verdict and judgment went for plaintiff in the sum of $17,500.00 and defendant's motion for a new trial was duly filed. While the motion was pending Frank A. Davis died and Mabel A. Davis, administratrix of the estate of deceased, was substituted as plaintiff. After such substitution the motion for a new trial was sustained and the substituted plaintiff appealed. Hereinafter the term plaintiff has reference to Frank A. Davis, deceased, who was the injured party and the original plaintiff.

The situs of this cause was in Kansas City, Kansas. Fairfax toll bridge extends north and south over the Missouri River from Kansas to Missouri. Plaintiff, an employee of the Kansas highway department, was superintendent of this bridge. Fairfax Road, a north and south paved street in Kansas City, Kansas, extends north to this bridge. The toll house is a short distance south of the bridge; the two 9-foot concrete slabs of Fairfax Road separate as they approach the toll house from the south and then converge after passing; southbound traffic over the bridge pay toll charges on the west side of the toll house and northbound traffic on the east side. The width of the roadway on the east side of the toll house is the 9-foot slab and a gravel shoulder width of which is not given. On the east side of the toll house is a step 5 feet long, 19 inches wide, and 9 to 10 inches high. February 8, 1945, about 5 p. m., plaintiff, according to his evidence, was on this step when struck and injured by a northbound tractor-trailer unit loaded with 2470 gallons of hot oil for delivery to Goetz Brewing Company, a customer of defendant, in St. Joseph, Missouri. The unit was driven by Otis B. Groomer, defendant's agent, we

will assume for the purpose of this appeal. There was a stop sign on the east side of Fairfax Road a short distance south of the toll house.

The negligence alleged and submitted was (1) excessive speed; (2) failure to stop at the stop sign; (3) failure to stop at the toll house; and (4) failure to give warning of the approach of the tractor-trailer unit. Among other defenses, not necessary to mention, defendant pleaded contributory negligence of plaintiff; but plaintiff proceeded on the theory that the alleged negligence on the part of defendant's agent Groomer was wanton under the law of Kansas and that contributory negligence was not available as a defense. And for the plaintiff the court instructed the jury: "If you find that Groomer was wantonly reckless and the facts to be as outlined and submitted in instruction No. 1, and if you find the issues for plaintiff under said instruction No. 1, then the fact, if it is a fact, that plaintiff was guilty of contributory negligence would be no defense, even though you may believe plaintiff was guilty of contributory negligence directly contributing to his alleged injuries."

The motion for a new trial was sustained on the ground that the court erred in submitting "the issue of wanton recklessness", and that is the only question presented here.

Plaintiff, as stated, was injured February 8, 1945. He testified: "I had been straightening up the supplies in the toll house; my car was parked directly across the street east from the toll house; U. S. highways 169 and 69 (Fairfax Road there) are heavily used public highways; toll men (collectors) are obliged to stand on this step (the one mentioned, supra); I saw through the south window of the toll house this truck (the tractor-trailer unit) coming from the south. When I was struck I was standing on that little platform (the step) there and was expecting to go across the street to my car; I saw the truck coming so fast I turned, and when I did the front end of the oil part of the truck (the trailer) struck my right arm; the tractor part had gone past me; my arm in turning stuck out enough to get hit; the force of the impact was about the elbow; it crushed the elbow; the impact knocked me off the platform (the step); threw me around and slammed me up against the building; I never lost my feet (did not go down), but I was slammed up against the building (toll house); I staggered out to the center of the highway (the slab east of the toll house); the truck had then gone on [974] (north); the truck did not blow any horn or give any warning as it approached the toll house." Plaintiff's evidence was that the speed of the truck was about 40 miles per hour; that it did not stop at the stop sign, and that the clearance between the truck and the step as the unit passed was about 2 inches.

Defendant obtained hot oil from the Phillips Petroleum Company, Kansas City, Kansas, and delivered it to his customers. The Goetz

Brewing Company of St. Joseph, Missouri, was one of his customers. Groomer lived in St. Joseph and for some time had been delivering oil to Goetz Brewing Company for defendant. He used his own tractor attached to defendant's homemade trailer tank. The tractor and the trailer together were termed a unit. Groomer would go from St. Joseph to Phillips Petroleum Company in Kansas City, Kansas; get the trailer tank filled with hot oil and go back to St. Joseph and deliver the oil to Goetz Brewing Company. On these trips down and back to St. Joseph he went over Fairfax Road and over the Fairfax Bridge. Going down he went on the west side of the toll house and returning he went on the east side.

Groomer, as a witness for defendant, testified: "Prior to February 8, 1945 (date of plaintiff's injury), we (truckers such as he) would when southbound give them (at the toll house) two tickets fastened together; they would keep both tickets and we would make our trip on into the refinery; load up and return back and not stop (at the toll house). On the afternoon of February 8, 1945, I had come into Kansas City, Kansas, for a load of fuel oil to be delivered to Goetz Brewery in St. Joseph; as I came in that day I handed the toll taker two tickets; I loaded about 4:30 p. m. and drove out in third gear; I did not stop at the toll house; my speed when I passed the toll house was about 15 or 20 miles per hour; my passing along the east side of the toll house on that afternoon was not different (from my prior passings). After I had passed the toll house and when I had stopped for a stop sign at 69 and 71 junction, a man drove up on my left and said, 'Fellow, I don't know; you might be interested to know; something happened back there at Fairfax Bridge'; I said, 'what do you mean?' He said, 'Well; seemed like there was a fellow hurt there as your trailer went by.' I went on to St. Joe with this load of hot oil; didn't exactly know what to do about it; stopped at the police station in St. Joe and told them that I had been informed that there had been an accident at the Fairfax Bridge involving this trailer, and that I would return immediately after unloading the oil which I did."

Groomer further testified: "As I went north along the east side of the toll house that afternoon there was a car and some men on the west side of the toll house; I did not see any one standing on the east step of the toll house; loaded as I was it would have been impossible to have gone 40 miles per hour passing the toll house; the truck was not rated that fast; it was a new truck and had governors on it; the governor was set at 40 miles in high gear and I was in third gear; 20 miles would have been my maximum."

On cross examination Groomer said that it was the custom (for truckers who had turned in two tickets when southbound) to sound the horn in day time when northbound and approaching the toll house and to flash their lights at night to let those at the toll house

know they were coming up. "I knew that the roadway north by the toll house was a heavily traveled highway; I knew that the roadway by the toll house on the east side was only 8 or 9 feet wide; I knew that when my truck went through there it would be very close to this platform (the step) that men (toll collectors) had to stand on; I knew that cars were parked on the east side of the road east of the toll house; I knew there was a stop sign on the east side of the road just south of the toll house. I did not know at the time that any part of the unit I was driving struck Mr. Davis" (plaintiff).

Defendant and several witnesses testified to the effect that prior to plaintiff's injury it was the custom of truckers such as Groomer to deliver to the toll collectors on the southbound trip two tickets, round trip, and then not stop in passing the toll house ▮▮▮ on the northbound trip. Plaintiff's evidence was to the effect that there was no such custom at any time. Also it appears in the record that on March 3, 1945, a little more than 3 weeks after plaintiff was injured, he signed a statement in which he, among other things, said: "As superintendent of the bridge I am in charge of its operation & have an office at 7th and Kindelberger. I also spend some time in the toll house. The road leading to the bridge runs north & south. On February 8, 1945, around 4:15 p. m., I had gone down to the toll house to straighten up some papers. I stepped out of the toll house a few minutes later & right into the left front corner of the trailer part of an oil truck. The truck was going pretty fast, around 40 or 45 m.p.h. & he continued on without stopping, apparently not knowing that he had hit me. * * * Cars and trucks that use the bridge pay the fee at the toll house. * * * We have 2 men there to take the tolls as the cars and trucks pass them. We have stop signs asking them to stop but in the rush hour the cars often just slow down & hand the money or tickets over. There is a very heavy grade leading up to the bridge and when weather is bad the trucks usually come up to the toll house, when heading north, at a high rate of speed so they can get up the grade which begins just north of the toll house. In such cases we usually know the drivers & they don't stop to pay the toll, but pay us on their return trip. Of course the drivers of these trucks are supposed to stop in good weather, but they never do. Most or all of the trucks when headed north for the bridge have to stop at the port of entry which is about 500 feet south of the toll house. However, the truck which hit me is not required to stop there as it hauls nothing but fuel oil. I have said that the trucks often don't stop but they do give a signal to let us know they are coming. However, this driver always drove through without stopping when headed north & hardly ever gave a signal. He did not give any signal on the day I was hurt. I was very tired that day as I had been at the office since 6 a. m. When I stepped out of the toll house that afternoon, the toll house being

in the middle of the road, I stepped right onto the highway. I don't remember whether I looked to see if traffic was coming up or not. * * *''

Plaintiff says that the court erred in granting a new trial on the ground that the issue on wanton recklessness should not have been submitted to the jury. As stated, the situs of the incidents giving rise to this cause was in Kansas, and the question, therefore, is to be determined by the law of Kansas. As supporting the proposition that the facts justify the submission of wanton conduct on the part of defendant, plaintiff cites: Atchison, Topeka & Santa Fe Ry. Co. v. Baker, 79 Kan. 183, 98 Pac. 804; Kniffen v. Hercules Powder Co. et al., 164 Kan. 196, 188 Pac. (2d) 980; 10 Blashfield's Cyc. of Automobile Law, Sec. 6617.

In the Baker case it appears that Sarah E. Baker, 71 years old, was killed by a Santa Fe freight train in a street in Olathe, Kansas. Her home faced east on a street 60 feet in width; two railroad tracks, about 12 feet apart, extended north and south in this street; the depot was a block and a half south of the home of deceased. In mid-afternoon deceased left her home; walked east; was struck and killed on the first track, the one nearest her home, by a northbound freight train running 15 miles per hour. The train was coasting; did not stop at the depot; did not sound the whistle or ring the bell after the engine passed the depot. Every point on the path taken by the deceased from her fence to the track commanded an uninterrupted view of the track to the south for a distance of three quarters of a mile; the engineer and fireman could have seen deceased had they looked; a city ordinance limited the speed of trains to 6 miles per hour.

It was held in the Baker case that it was proper to submit the issue of wanton negligence. The court quoted, with approval, from Lake Shore & M. S. Ry. Co. v. Bodemer, 139 Ill. 596, 29 N. E. 692, as follows: ''If an engineer, knowing that persons are accustomed to cross a track between the streets of a ▮▮▮ large and crowded city, drives his engine forward 'recklessly,' that is to say, with indifference as to whether such persons are injured or not, and at a rate of speed 'greatly' in excess of that limited by a city ordinance, an injury thereby inflicted upon one of such persons, even though he be a trespasser, will be regarded as the result of 'such a gross want of care and regard for the rights of others as to justify the presumption of willfulness or wantonness.' '' After quoting from the Illinois case the court went on to say:

''The conduct of the employees in charge of an engine in failing to take measures for the protection of a person upon the track can be characterized as 'wanton,' in the sense in which that word is used in this connection, only when they actually know of his presence, or when the situation is substantially the same as though they had

such knowledge—when such knowledge may fairly be imputed to them. It is not enough for that purpose that the exercise of ordinary diligence would have advised them of the fact, for their omission of duty in that regard amounts only to negligence. Nor is it enough that they know some one might be in the place of danger. The probability must be so great, its obviousness to the employees so insistent, that they must be deemed to realize the likelihood that a catastrophe is imminent, and yet to omit reasonable effort to prevent it because indifferent to the consequences. The evidence here falls short of that in the cases from which the foregoing quotations are made only in the size of the city and the amount of travel over its streets; the difference being one of degree. It affords a relatively slight basis for imputing to the engineer or fireman what amounts almost to a knowledge of the decedent's danger, but we conclude that it was sufficient to entitle the plaintiff to go to the jury on this issue.''

Plaintiff in the Kniffen case was injured at a crossing of the privately owned railroad track of the defendant Hercules Powder Company near DeSoto, Kansas. It was held that the plaintiff made a submissible case on the issue of wanton negligence or as it is sometimes expressed wilful and wanton conduct. In a resume of the facts the court said [188 Pac. (2d) l. c. 988]:

''The jury had a right to believe: Hercules designated the place for employees with vehicles to cross the tracks; it patrolled the roadway; no watchman was stationed at the crossing; there was a continuous line of traffic over this crossing with the vehicles in close proximity to each other and that was true the morning of the accident before twenty minutes of eight o'clock; the light on the engine was dim; owing to other lights on the premises the engine could not be noticed approaching; traffic rules required automobiles to keep moving and it was a violation of such rules for them to stop in the line of traffic; the engineer could see the automobile traffic passing over and approaching the crossing when such traffic was 780 feet from the crossing and while the engine was 250 feet from the crossing; no trains would be encountered at the crossing while employees were entering to go to work; the maximum speed limit for trains was 20 miles per hour; the engine negotiated the crossing between 45 and 50 miles per hour. The jury could conclude that negotiation of the crossing with a train or engine, under such circumstances, involved imminent peril to some one and that the engineer while conscious of such fact passed over it with indifference to consequences.''

We do not think that the cases cited by plaintiff support the contention that a submissible case was made under the law of Kansas on the issue of wantonness. In Frazier v. Cities Service Oil Co. et al., 159 Kan. 655, 157 Pac. (2d) 822, the court reviewed quite

a number of Kansas cases on the subject of alleged wanton conduct in personal injury causes. There the court said [157 Pac. (2d) l. c. 829]:

"From the above cases and those cited therein, it may be concluded that as to injuries inflicted, wanton conduct or wantonness comes between negligence on the one hand and wilful or malicious misconduct on the other; that it is more than negligence and less than wilfulness, and to constitute wantonness the acts complained of must ▮▮▮▮ show not simply lack of due care, but that the actor must be deemed to have realized the imminence of injury to others from his acts and to have refrained from taking steps to prevent the injury because indifferent to whether it occurred or not. Stated in another way, if the actor has reason to believe his act may injure another, and does it being indifferent to whether it does or not, he is guilty of wanton conduct."

Elliott. v. Peters, 163 Kan. 631, 185 Pac. (2d) 139, was to recover damages for personal injury and property damage sustained in an automobile collision. Wanton conduct on the part of the defendant was relied upon; a demurrer to the petition was sustained and on appeal it was held that the allegations were not sufficient to support wanton conduct on the part of the defendant. The facts appearing in the petition were: The collision occurred on U. S. Highway 81 which runs north and south between the cities of Newton and Wichita, Kansas; the highway was a major and extensively traveled thoroughfare; was concrete, four lanes, two on each side of an island about three feet in width; the island did not extend into the intersection where the collision occurred. At a point on the line between two counties highway 81 was intersected by an extensively traveled east and west blacktop road. The intersection was on the crest of a hill which sloped north and south from the intersection; such fact was well known to the defendant. December 2, 1945, about 9:45 p. m., the plaintiff was driving his car north; was in the east lane of 81; as he approached the intersection he slowed down to 15 miles per hour and entered the intersection; turned left and proceeded across the southbound traffic lane of 81; his purpose was to go west on the blacktop road. As he was about to pass out of the intersection and when his car was astride the west half of the southbound traffic lane the defendant's car, traveling south on 81, struck plaintiff's car.

It was further alleged that defendant was driving 80 miles per hour; knew or should have known of the extensively used blacktop road; knew that highway 81 was intersected by the blacktop road at the crest of the hill; knew that his view of the intersection would be restricted; knew that he could not stop at the speed he was going in time to avoid collision with any vehicle that might be in the intersection. It was further alleged that defendant failed to keep

a lookout; that there were four persons in the front seat of his car which would hamper efficient driving; that his car was in a defective mechanical condition; that the lights were defective.

In the Elliott case the court reviewed a number of cases involving the question of wanton conduct, and held that the facts alleged were not sufficient to raise the issue of wanton conduct on the part of the defendant. Defendant in the present case cites many cases to support the contention that under the facts it was improper to submit the issue of wanton conduct. Among the cases cited are these: Stout v. Gallemore, 138 Kan. 385, 26 Pac. (2d) 573; Aduddell v. Brighton, 141 Kan. 617, 42 Pac. (2d) 555; Anderson v. Anderson, 142 Kan. 463, 50 Pac. (2d) 995; Leabo v. Willett, 162 Kan. 236, 175 Pac. (2d) 109; Plant v. Thompson, 359 Mo. 391, 221 S. W. (2d) 834. It will not be necessary to review these cases; some of them and others are reviewed in the Elliott case, supra, and the recent case of Plant v. Thompson, supra, considers at some length the subject of wanton conduct.

On the issue of wanton conduct plaintiff is entitled to all the favorable evidence on that question including, of course, any favorable evidence from the defendant. But, in view of the law of Kansas as we see it, we are constrained to rule that plaintiff failed to make a submissible case on that question.

The order granting the new trial should be affirmed and the cause remanded; it is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.