## No. 40,820

DE ANNA DIRKS, a Minor, by OSCAR DIRKS, Her Father and Next Friend, *Appellee,* v. GALEN GATES, a Minor, by EDWIN GATES, His Father and Next Friend, *Appellant.*

(322 P. 2d 750)

Opinion filed March 8, 1958.

James P. Mize, of Salina, argued the cause, and C. L. Clark and Tom Lillard, Jr., both of Salina, were with him on the briefs for the appellant.

Jerry M. Ward of Great Bend, argued the cause, and S. R. Blackburn, Tudor W. Hampton, and J. W. Hannah, all of Great Bend, were with him on the briefs for the appellee.

The opinion of the court was delivered by

ROBB, J.: This is an appeal from a final judgment in favor of a guest against the host driver of an automobile within the purview of G. S. 1949, 8-122b.

The guest, appellee, will be referred to as plaintiff and the host driver, appellant, as defendant. There is no question concerning the pleadings and they will not be summarized except to say they show the action to be within the purview of the commonly termed guest statute (G. S. 1949, 8-122b) whereby plaintiff not only must allege but must prove that her ". . . action for damages . . . for injury . . . resulted from the gross and wanton negligence" of the defendant.

The evidence showed there was little dispute about the following material facts. On the night of May 20, 1955, in celebration of their graduation from Great Bend High School, plaintiff and defendant in company with another couple (who will be referred to as Nadine and Robert) rode ten miles east over what was called highway 50 North detour to Ellinwood in a 1950 Chevrolet Tudor sedan. The detour, running east and west and a little south of and parallel to highway 50 North, was intersected about midway between the two towns by a north and south road known as the Dartmouth road. The weather was clear and dry and the detour was blacktop; the surrounding country was open and level. The Dartmouth road intersection with the detour was from one to three feet higher than the rest of the detour.

The trip from Great Bend to Ellinwood was uneventful and there were no complaints as to defendant's driving. The average speed driven was 55 to 65 miles per hour. While dancing in Ellinwood the four had no more than two beers each and each of the boys had one drink of gin which consumed about one-third of a pint thereof but there was no drinking on the road to or from Ellinwood nor was there any contention of intoxication. The trip back to Great Bend started about 1:00 a. m. on May 21, 1955, and upon entering the detour, a Plymouth automobile passed defendant's Chevrolet. Defendant was driving, plaintiff was seated on his right and the other couple were in the back seat. After passing defendant on the left the Plymouth returned immediately to the right or north side of the detour and proceeded to decelerate its speed. Defendant overtook and passed the Plymouth and after traveling about half a mile, the Plymouth again passed defendant. Up to this time everything had been done in the ordinary and usual manner with no attempt on the part of either driver to prevent the other from passing. About half a mile east of the Dartmouth intersection at an admitted speed of 60 miles per hour, defendant again undertook to pass, the Plymouth's speed was accelerated to prevent defendant's passing but defendant got ahead and turned his head to look out the rear side window of his car to see if he could return to the right or north side of the detour. Defendant's car veered to the left or south side of the road, Robert shouted, "Look out for the sign," which was too late, because defendant's car had hit the road sign on the left or south shoulder and had gone on down the south ditch of the detour where it came to rest against a telephone pole near

the west edge of the Dartmouth road. The occupants of defendant's car were immediately unconscious.

Three weeks later plaintiff, Nadine, and Robert each made written signed statements to Tim Shea, adjuster for defendant's public liability insurer, which were introduced in evidence. Statements made therein were partly repugnant to their oral testimony during the trial. These differences were explained by plaintiff to be deliberate falsifications as the result of their agreement with and at the request of defendant. No one had ever asked defendant to stop his car or let him or her out but plaintiff, Nadine, and Robert all testified that plaintiff said, "Galen, don't pass the car again," as defendant turned from the north to the south traffic lane to negotiate the final passing of the Plymouth at a point one-half mile east of the Dartmouth intersection. Defendant did not acknowledge the request and testified that he did not hear plaintiff. In a report to the sheriff's office defendant fixed his speed at 70 miles per hour. Investigating officers were six miles from the accident, received notification thereof at 1:25 a. m. and arrived at the scene at 1:30 a. m.

There were some sharp conflicts in the testimony offered by plaintiff and that offered by defendant and without fully repeating all of it, we will endeavor to narrate the pertinent parts thereof.

Turning first to the testimony of the investigating officers to glean the physical facts at the scene of the accident, Bill Snow, a deputy sheriff, traveled the detour rather frequently; he said it was narrow blacktop, 23 feet wide, with no defects but it had been continually worked and in his opinion it was a terrible road; the Dartmouth road at the intersection was higher than the detour so that one had to take it easy going over the incline; the tracks of defendant's car left the detour pavement 189 feet east of the east edge of the Dartmouth road, came to rest 29 feet west of the west edge of the Dartmouth road, and the total distance from where the Gates car left the detour pavement to where it came to rest was 246 feet; a safe speed over the detour was 50 miles per hour and defendant's speed according to his own statement was 70 miles per hour just before the accident.

William C. Rogers, another deputy sheriff, testified that 50 miles per hour was the maximum safe-driving speed; the detour was narrow with poor shoulders; the blacktop was chipped and had small holes at the edge of the mat; he concluded there was an indication of reckless driving based on the measurements from the

time the car left the blacktop, the obstruction it encountered, the distance it traveled and the distance from the intersection that the pass was started. Cross-examination showed this officer did not know where the passing started, or whether defendant became unconscious when the highway sign was hit. No arrest was made. The officer's report showed no defects in the blacktop, the night was dark, and the terrain was rural open country.

Plaintiff, in addition to what has already been set out, testified that the first time the Plymouth passed them defendant's speed was 55 miles per hour, when defendant first passed the Plymouth his speed was 65 miles per hour, when the Plymouth passed the second time, defendant, who was then traveling 70 miles per hour, said, "He can't do that to me." Plaintiff was getting scared because she began to realize there was a race going on although there had been no prearranged race. There had been no oncoming vehicle from the west and in negotiating the pass the last time, defendant attained a speed of 80 to 85 miles per hour which she learned by looking at the speedometer. She protested the passing, as already stated, by saying, "Galen, don't pass the car again." As defendant edged ahead of the Plymouth after traveling neck and neck therewith, he turned his head to look back over his right shoulder, the car swerved or went out of control and Robert made his previously stated warning about the sign. On cross-examination defendant's counsel introduced and used plaintiff's statement to Shea, the adjuster, to impeach her testimony. On re-direct examination a question was asked and answered as follows:

"Q. Oh, I see. Now, when Mr. Shea entered the room, will you tell the jury just what he said? A. Well, he told me that his name was Tim Shea, and that he was an insurance investigator and that he was representing Galen Gates' insurance company."

The morning following the accident defendant and Robert went to the hospital room of plaintiff and Nadine, where it was stated the boys had made up a story of meeting a car to coincide with defendant's statement to the police. Plaintiff agreed to "stick with this story," defendant would not get into trouble, and their bills would be paid. The pertinent parts of plaintiff's written statement to Shea were:

"I have been with Galen before and although he drives at a fast rate of speed on this particular occasion he was not driving at any exceptional rate of speed. When I got into the car, I put my head back and closed my eyes the radio was playing and I remained in this position until we were wrecked. I

don't know where the accident [occurred] only what I have been told. I don't know what happened but do recall that we could have been passing a car at the time of the accident. From the time we left Ellinwood, Kansas, to the scene of the accident no one in the car complained as to the way Galen was driving. I did not complain as I did not think he was driving in an unusual manner."

John Marye, for plaintiff, testified that two or three nights after the accident defendant told him in the presence of Robert that he, the defendant, had been passing a car and they had been racing, he had looked back and lost control of the car. In regard to his and Robert's statements, defendant stated they had said another car had been coming from the other way.

Robert's testimony, in substance, corroborated plaintiff's evidence already set out and in addition he testified that as defendant was attempting to pass the Plymouth the second time, it speeded up so defendant had to go faster to try to pass. Plaintiff asked defendant not to race and not to pass the car. Defendant's car was traveling as fast as it could go, around eighty, eighty-five, or ninety miles per hour. Pertaining to the statements, this witness testified that defendant said they "would tell them" that another car was coming which they didn't see because of the hump two to two and a half feet high in the road and when they saw the lights of the oncoming car, they went off the road trying to avoid a head-on collision therewith. Robert further testified the defendant's car and the Plymouth had traveled neck and neck quite some time and both cars were going as fast as they could. He had warned defendant of the sign but it was too late. They had not met another car that night.

Nadine, the other girl in defendant's car, testified in corroboration of testimony of plaintiff and in addition that the road was level but rough with chuckholes. She said they were racing, she was a little scared and raised up and rested her arm on the back of the front seat. At that time plaintiff told defendant not to go around for the second time, but defendant did not acknowledge the request. Both cars were going at a high rate of speed. Nadine knew they were racing because defendant, as he started to pass the last time stated, "He can't do that to me." In regard to the agreement with defendant as to what should be said in her statement to the insurance adjuster, Nadine testified to substantially the same things as had plaintiff and Robert. Mr. Shea had come to her home and had obtained her statement. The record shows Nadine then testified as follows:

"Q. What else did he say before he took that statement? A. Mr. Shea introduced himself as Tim Shea and said he was a representative of Galen Gates' insurance company on his car, and—"

The plaintiff rested her case and the defendant demurred to her evidence which demurrer was overruled by the trial court.

Defendant's first witness was Tim Shea, the insurance adjuster, who stated that he had taken the statements of plaintiff, Robert, and Nadine. He stated there was conversation about defendant having told him that medical and hospital bills would be paid but that he had informed them there was no medical coverage in defendant's insurance policy.

Defendant then testified in his own behalf. Up to the point where he undertook to pass the Plymouth the last time, there was no conflict between his testimony and that offered on the part of plaintiff. Defendant decided to pass since he did not think anybody liked to have a car slow down in front of him and then just "tail" it because a person is not supposed to follow too close. This was about a half mile east of the Dartmouth intersection. In a quarter of a mile the cars were alongside each other and the Plymouth accelerated. Defendant admitted accelerating to about seventy miles per hour and that his car would go a little over eighty. He looked back over his shoulder to see if he had passed the Plymouth far enough to pull back to his proper side of the road and his rear bumper was even with the Plymouth's front fender when he heard Robert's warning about the sign. As he turned around he saw oncoming headlights close enough to worry him and he hit the sign. He had seen the headlights before, they seemed a long way off, but their view was cut off by the Dartmouth road rise of a foot or a foot and a half. He had not heard plaintiff's warning not to pass again. His car left the highway some 240 feet from where it came to rest. He admitted the conversation with John Marye and the fact that an agreement was made at his request as to how plaintiff, Robert, and Nadine would make statements to Shea but his version was that there was to be no information volunteered about the drinking or the open bottle in the car because that would cause the defendant to lose his driver's license. He admitted that he had told the plaintiff, Robert, and Nadine that he would pay their medical and hospital bills and he was surprised when he learned he did not have medical coverage.

The jury returned a general verdict in favor of plaintiff in the sum of $9,049.26 and answered the following special questions:

"No. 1. If you find that Galen Gates was guilty of wanton conduct, as defined in the court's instructions, then state fully and specifically the acts which constituted such wanton conduct. A. Guilty.

"1. Driving at high rate of speed.

"2. Disregard to the guest safety.

"3. Disregard to the road hazard and car coming.

"No. 2. If you answer Question No. 1, state whether DeAnna Dirks saw Galen Gates committing those acts and believed there was imminent danger of injury. A. Yes.

"No. 3. Did DeAnna Dirks protest or remonstrate against the acts of Galen Gates in driving the automobile? A. Yes.

"No. 4. If you answer Question 3 'yes', then state specifically what she said in protest and remonstrance and state how far the Gates car was from the point of accident when she said it. A. 'Don't pass that car, Galen.'

"While trying to pass car last time, at least ¼ mile east of accident.

"No. 5. Did DeAnna Dirks at any time after leaving Ellinwood ask Galen Gates to stop the car and let her out before the accident occurred? A. No.

"No. 6. If you answer Question No. 5 'yes', state how far the Gates car was from the point of the accident when she asked him to stop it and let her out. A. None.

"No. 7. Do you find that Galen Gates consciously realized the imminent danger of injury at any time before the accident occurred? A. Yes.

"No. 8. If you answer Question No. 7 'yes', then state where his car was with reference to the highway sign it first struck when he first consciously realized the imminent danger of injury. A. 20 feet in front of sign.

"No. 9. If you answer Question No. 7 'yes', then state whether there was sufficient time for Galen Gates to take the necessary actions to avoid the accident after he first consciously realized the imminent danger. A. No.

"No. 10. If you find that Galen Gates looked to the right rear of his car just before it struck the highway sign, state whether or not he did so to make sure he was sufficiently clear of another car to enable him to safely return to the north half of the pavement? A. Yes."

Defendant moved to set aside answers to questions (1) and (3) for the reason they were not supported by evidence. He then moved for judgment on the remaining questions and answers because they compelled a judgment for defendant or, in the alternative, defendant moved for a new trial setting out practically all the statutory grounds therefor. The trial court overruled all these motions and entered judgment for plaintiff against the defendant in the sum of $9,049.26 on the jury's general verdict.

Since there is no controversy over the drinking of beer and gin or that anyone was under the influence thereof, we will not go into detail thereon, as did counsel in the record. Defendant claimed the only reason for the agreement that all the statements to Shea, the insurance adjuster, would be in accord was that otherwise it might cost him his driver's license.

As stated at the outset, plaintiff had the burden of proving gross and wanton negligence (G. S. 1949, 8-122b; *Stout v. Gallemore,* 138 Kan. 385, 26 P. 2d 573; *Wright v. Pizel,* 168 Kan. 493, 494, 214 P. 2d 328) and as more recently stated in *Long v. Foley,* 180 Kan. 83, 229 P. 2d 63:

"In order to recover damages under G. S. 1949, 8-122b, commonly referred to as the automobile guest statute, the evidence must show that the host's conscious conduct indicated a reckless disregard and complete indifference and unconcern for the probable consequences of his wrongful act." (Syl. ¶ 1.)

In the Long case (p. 89) we, in effect, said that in determining that the necessary facts of a given case constitute "gross and wanton negligence" they are to be measured by the same standards as in cases where the sufficiency of pleadings are involved. We find the rule set out in the Long case also followed in *Elliott v. McKenzie,* 180 Kan. 344, 304 P. 2d 550, where the court considered a demurrer by defendant to the evidence of the plaintiff. Many of our cases relating to the guest statute are cited and analyzed in these two opinions but we will not repeat those discussions here. The rule determining the standard to be applied in order to ascertain the presence of "gross and wanton negligence," as restated in the Elliott case, is:

". . . a wanton act is something more than ordinary negligence, and yet it is something less than willful injury; to constitute wantonness, *the act must indicate a realization* of the imminence of danger and a reckless disregard and complete indifference and unconcern for the probable consequences of the wrongful act. It might be said to include a willful, purposeful, intentional act, but not necessarily so; *it is* sufficient if it indicates a reckless disregard for the rights of others with a total indifference to the consequences, although a catastrophe might be the natural result.

". . . and to constitute wantonness the acts complained of must show not simply lack of due care, but that the actor must be deemed to have realized the imminence of injury to others from his acts and to have refrained from taking steps to prevent the injury because indifferent to whether it occurred or not. Stated in another way, if the actor has reason to believe his act may injure another, and does it being indifferent to whether or not it injures, he is guilty of wanton conduct." (p. 346.) (Our emphasis.)

When we consider the evidence in our present case and give it the benefit of all inferences that may properly be drawn from those portions favorable to plaintiff (*Haga v. Moss, Administrator,* 181 Kan. 171, 311 P. 2d 281), we are compelled to say that even though some of the evidence was conflicting or contradictory, the trial court was correct in holding the evidence was sufficient to show "gross

and wanton negligence" on the part of defendant when we further apply the standard restated in the Long and Elliott cases.

The defendant contends that if he was guilty of gross and wanton negligence then plaintiff was likewise guilty of that same degree of negligence, under the rule in *Kniffen v. Hercules Powder Co.,* 164 Kan. 196, 188 P. 2d 980, where it was held that "willful or wanton conduct of a plaintiff is a defense to defendant's wantonness." (Syl. ¶ 4.) He further relies on *Naglo v. Jones,* 115 Kan. 140, 142, 222 Pac. 116, where an invitee failed to warn a driver of his negligent operation of an automobile and did not remonstrate and ask for an opportunity to leave the car. Defendant cites other decisions but in general they hold the same as the Naglo case—that if a guest does not take measures for his own safety, "his negligence is of the same grade as that of the driver's negligence, and he cannot recover." (*Mason v. Banta,* 166 Kan. 445, 450, 201 P. 2d 654.) The foregoing rule cannot be applied in the present case because the plaintiff had no reason to realize the imminence of danger until defendant undertook to pass the Plymouth and then she did not sit idly and silently by. She remonstrated, "Galen, don't pass the car again." Under this situation, the question of plaintiff's gross and wanton negligence became a matter for the jury's determination and not a matter of law for the court. (*Lawrence v. Kansas Power & Light Co.,* 167 Kan. 45, 49-50, 204 P. 2d 752.) The jury found plaintiff here was not guilty of the same gross and wanton conduct as defendant, and we will not disturb the verdict for that reason.

See the Lawrence case, also, for a discussion of warnings and their sufficiency and effect in determining whether they present questions for the determination of a jury. This contention of defendant was within the province of the jury and the trial court was correct in submitting it thereto.

The next contention is that the answer to question (1) should be set aside because it finds no more than negligence but we are unable to see how defendant can so contend in view of the quoted evidence. We are bound to consider the entire answer in the light of the evidence and not divide it into parts so as to minimize the over-all effect of the three parts. (*Fyne v. Emmett,* 171 Kan. 383, 387, 233 P. 2d 496.)

As to defendant's request to strike the jury's answer to question (3), there was no conflict between plaintiff's witnesses on this point. In fact, they were in complete accord that plaintiff did remonstrate.

However, defendant stated he had not heard her admonition and he did not think she made it. Citations are unnecessary to substantiate the rule that a jury is not bound to believe or disbelieve any particular witness or testimony so that when the jury answered the question as to whether plaintiff had protested or remonstrated against defendant's act in driving the automobile, in the affirmative, the matter was thereby determined. Of course, it is apparent if these two answers and the questions to which they were directed are stricken, it would strengthen defendant's next point that the answers to special questions required the trial court to enter judgment for defendant *non obstante veredicto* but since we have agreed with the trial court that the questions and answers were proper, this motion for judgment *non obstante veredicto* admitted there was evidence to sustain the special findings and they are to be given a construction that will bring them into harmony with the general verdict. (*Cain v. Steely,* 173 Kan. 866, 874, 252 P. 2d 909.) The general verdict may be set aside only when the special findings are contrary to the verdict and compel a judgment setting aside the general verdict as a matter of law. (*Unruh v. Kansas Turnpike Authority,* 181 Kan. 521, 313 P. 2d 286.) We cannot follow defendant's contention but to the contrary believe the trial court was correct in refusing to strike questions (1) and (3) and the answers thereto, and in overruling defendant's motion for judgment *non obstante veredicto* and on the special findings.

Defendant inferentially complains that he acted in an emergency, as shown by the jury's answers to questions (7) and (9) but we cannot make such a deduction from those answers. In view of what has been said regarding defendant's acts of negligence and the degree thereof, we are forced to conclude that since his acts of negligence created the emergency, he cannot avoid liability on the grounds that he acted in an emergency. (*Meng v. Penner,* 179 Kan. 789, 792, 793, 298 P. 2d 246; *Cooper v. Sorenson,* 182 Kan. 560, 322 P. 2d 748, this day decided.)

The first argument advanced by defendant on the assignment of error because the trial court overruled the motion for new trial has, in the main, already been treated by statements made herein and we think it unnecessary to repeat or digest the additional authorities cited.

We are unable to understand the position of defendant on his final point wherein he claims that when he moved for a mistrial

by reason of the word *insurance* being injected into the trial in front of the jury because of answers given by plaintiff and her two witnesses on re-direct examination, it should have been sustained by the trial court. The circumstances were that defendant, on cross-examination of these witnesses, identified and introduced the written statements made by plaintiff, Robert, and Nadine to Shea, the insurance adjuster. These statements were introduced to discredit the testimony of the respective witnesses who in each case testified that his statement contained falsehoods made in compliance with a previous agreement with defendant, and they were so used in cross-examination. The ensuing re-direct examination of each witness revealed that the written statements were given to Shea as adjuster for defendant's insurer. When defendant introduced his evidence, he placed Shea on the witness stand. Shea testified as to his capacity with the insurance company and that he thought plaintiff, Robert, and Nadine had told him the truth in their statements notwithstanding their testimony that they had lied to him. Under such circumstances, we think that defendant cannot now claim that he was so entitled to a ruling of mistrial at the time that the judgment should now, on this ground alone, be set aside and a new trial granted to him.

Plaintiff's petition asked judgment in excess of $25,000 and the verdict was for $9,049.26 so defendant has not made it affirmatively appear that any prejudice resulted to his substantial rights by the injection of the word *insurance* into the case. (G. S. 1949, 60-3317.) We are therefore controlled by *Thompson v. Barnette*, 170 Kan. 384, 227 P. 2d 120, which was as strong, if not stronger, on the use of the word *insurance* than the case now before us. The Thompson case held that since no prejudice was shown to the defendant, no reversible error was made to appear. (p. 389.) Under that rule we are constrained to say that no reversible error was made to appear here by reason of the word *insurance* being injected into the case.

Careful consideration has been given to every contention of the defendant but nothing has been shown to warrant a reversal of the judgment and the granting of a new trial. The judgment, therefore, is affirmed.